UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 CIV 9044**

------------------------------------------------x

WILLIAM B. CORLEY,

_____ CIV. _____ (     )

        Plaintiff,

        - against -

**COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

MARC JAHR,
MELISSA BARKAN, JIM QUILIVAN,
JOSEPH SPITZER, BRIAN LOFTMAN,
JANE AND JOHN DOES.

        Defendants.

------------------------------------------------x

Plaintiff WILLIAM B. CORLEY ("Plaintiff") alleges as follows:

## JURISDICTION

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that all of Plaintiff's claims arise under the Constitution of the United States.

2.     This Court also has subject matter jurisdiction pursuant to the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended, prohibiting discrimination in the sale, rental, and financing of dwellings, based on race, color, national origin, religion, and sex; and, the Americans with Disabilities Act, 1990, as amended.

3.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3), in that Plaintiff seeks to redress the deprivation, under color of state law, regulation, custom, and usage, of his rights, privileges, and immunities secured by the United States Constitution.

## VENUE

4.     Venue lies in this Court pursuant to 28 U.S.C. § 1343(b)(1), as jurisdiction of this action is not founded solely on diversity of citizenship, Plaintiff resides in this judicial district, and all defendants reside in New York.

5.     Venue also lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), as jurisdiction of

this action is not founded solely on diversity of citizenship, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

6.      The address for Defendants Marc Jahr, Melissa Barkan, and Jim Quinlivan is Housing Development Corporation, 110 Williams Street, New York, NY 10038-3901. The address for Defendant Joseph Spitzer is Allstate Realty Associates, 5420 13th Ave Brooklyn, NY 11219. The address for Defendant Brian Loftman is "The Aspen", 1955 First Avenue, 10029.

## PARTIES

7.      Plaintiff William B. Corley is a citizen and resident of New York.

8.      Defendant Marc Jahr is a citizen and resident of New York. At all times during the events described in this complaint, he was acting under color of State or City law as President of the Housing Development Corporation of New York City (hereafter "HDC") and as a supervisor of Defendants Barkan and Quinlivan. Defendant Jahr is sued in his individual capacity.

9. Melissa Barkan is a citizen of New York and a resident of this judicial district. At all times during the events described in this complaint, she was the Freedom of Information Law Officer (NYS) for HDC and was acting under color of State of City law, including the New York State Penal Law, on behalf of HDC. Defendant Barkan is sued in her individual capacity.

10.      Defendant Jim Quinlivan is a citizen and resident of New York. At all times during the events described in this complaint, he was acting under color of State or City law as Senior Vice President, Portfolio Management, on behalf of HDC. Defendant Quinlivan is sued in his individual capacity.

11. Defendant Joseph Spitzer is a citizen and resident of New York. At all times during the events described in this complaint, he was acting under color of law as a principal of 100 Street Tri Venture LLC and signatory to "Regulatory Agreement between 100 Street Tri Venture LLC and New York City Housing Development Corporation", dated November 13, 2002, in addition to Real Property Law (NYS), Rent Stabilization Code (NYS), Fair Housing Act (US), United States Housing Act 1937, and, other State and Federal Laws continuing through the filing of this complaint. Defendant Joseph Spitzer is also a principal of Allstate Realty Associates, the managing agent for the premise building. In both capacities, he is responsible for the supervision

of Defendant Brian Loftman. Defendant Spitzer is sued in his individual capacity.

12.     Defendant Brian Loftman is a citizen and resident of New York. At all times during the events described in this complaint, he was acting under color of law as an employee of 100 Street Tri Venture LLC, Allstate Realty Associates, and building manager of "The Aspen" property. At all times during the events described in this complaint, he was fully cognizant of his duties and obligations under the laws and statutes enumerated under "2" and "3", above. Defendant Loftman is sued in his individual capacity.

## STATEMENT OF CLAIM

13.     On November 13, 2002 100 Street Tri Venture LLC signed a "Regulatory Agreement" with HDC providing for various restrictions on Tri Venture's use of the apartments, or units, in exchange for $ 46 million in financing from HDC. The building, known as "the Aspen", is regulated under a "50-30-20" program regulated by HDC. In particular, under the terms of the Regulatory Agreement, 50% of the 232 units may be rented at "market-rate", 30% of the units at "moderate-rate", and the remaining 20% at low-rate. The Regulatory Agreement further requires that for the first 15 years of "Occupancy Restriction Period" Tri Venture must rent at least 20% of the total units to low-income tenants. The Regulatory Agreement does not restrict 100 Street Tri Venture LLC from renting more than 20% or 30% of the units to low-income and moderate-income.

14. The Regulatory Agreement (hereafter the Agreement) defines moderate-income to mean individuals who execute a lease for a unit, and, whose Annual Income does not exceed the lesser of (a) two hundred fifty percent of the Area Median Gross Income as determined by the United States Housing and Urban Development (HUD), or (b) seven times the annual rent of such unit. In 2004 the Area Median Gross Income for New York, New York was  $ 54,400 and the 40% low-income amounts was therefore $ 21,760 and the 50% low-income amount was $ 27,200. In 2005 the Area Median Income was the same as 2004 resulting in the same 40% and 50% low-income calculations. These baseline definitions and calculations will be referenced within.

15.     In and about October of 2004 Plaintiff visited the subject premise seeking an available rental unit. He was taken to view one, and only one, apartment, apartment 540.

Standing beside the real estate agent employed by Allstate Realty Associates and 100 Street Tri venture LLC, looking out the window of that apartment the real estate agent asked Plaintiff whether he would be interested in a "patio" apartment that could be seen from the window. Plaintiff asked the rate of rental and was told "twenty-two hundred" ($ 2,200) monthly. Plaintiff responded, "No". The real estate agent stated the cost of rental of apartment 540 as "$ 1,854". Plaintiff informed he would call the agent the next day with a decision. That next day Plaintiff called the agent, asking, "Are you sure you cannot make the rent lower?" The agent responded empathically, "No, that's it...and you have until five o'clock to make your decision." Plaintiff reflected momentarily—there were two other apartments to be considered but this was the only one that was available with certainty—called the real estate agent back, informing that he would come to sign a lease the next day, which he in fact did.

16. The statement of the real estate agent concerning the rental amount and availability of units was intentionally and knowingly false. She would later become a tenant within the building. It is a virtual certainty that she did *not* rent at the market-rate. From Plaintiff's initial visit, continuing throughout his tenancy to the present time, no notice to potential renter's or current tenants of HDC's involvement in the property was ever posted, despite the fact that HDC's procedures, which Plaintiff has personally viewed and of which he has a copy, state emphatically that a large sign stating HDC's involvement must be prominently posted.

17.    Plaintiff is a disabled veteran, a senior citizen, and a person of color. On his permanent return to the State of New York, in November 2004, Plaintiff anticipated he would return to either of two executive, self-employed, occupations he had previously worked. For the eight years prior Plaintiff had been severely limited in his occupational choices because of a family situation to which he had to attend in the State of Washington. Plaintiff, nevertheless maintained a residence in New York City, voted in all Presidential elections as an absentee from New York State. Plaintiff became the first and only tenant of apartment 540 at the subject premise, 1955 First Avenue, New York, NY 10029.

18.    In October 2005 Plaintiff underwent two surgeries. Preliminarily to the surgery Plaintiff was misdiagnosed, by a Veterans Hospital doctor, as having a thoracic aneurism of 5.5 centimeters, with 5.6 centimeters being the dividing limit for the necessity of immediate open-heart surgery. Plaintiff, in consultation with his doctor, concluded rightly, that rather than return to the stress levels his businesses required he should, or must, immediately reduce work-related

stress. On November 15, 2005 Plaintiff wrote to Defendants Spitzer and Loftman requesting, in the light of his health crises, that his rent be lowered. Within the letter Plaintiff stated the reason for his request and his income. Because of Defendants' (collectively) failure to provide any notice of the status of the property Plaintiff did not have any idea of "income limits", "qualification "requirements", or, an "application process". Neither Defendant Spitzer nor Loftman responded to Plaintiff's November 15, 2005 letter. Plaintiff stopped at the office in the building, where Loftman is present, full-time, everyday, to ask about a response to his letter. Loftman called in the superintendent, directing him to show Plaintiff an apartment on the sixth floor. The superintendent escorted Plaintiff to that sixth floor apartment for viewing. On return to Loftman's office Plaintiff asked the rental amount for the apartment he had just been shown. Loftman said, "fourteen hundred" [dollars]. Loftman also said, "You will need to get one of your business friends to write something up…the minimum income is $ 55,000.00." Plaintiff asked, "What about the low-income apartments?" Loftman said, "What [as an exclamation not a question] I can't get Adam Clayton Powell's [relative in here]." Plaintiff does not recall the proximity of the relation mentioned, whether it was son, or nephew, but the relation mentioned was very close to former Congressman Adam Clayton Powell.

19.     In an affidavit, filed in the Supreme Court of the State of New York, Loftman committed perjury, denying that he said, "What [as an exclamation not a question] I can't get Adam Clayton Powell's [relative in here]." What is certain, and cannot be denied, is that Loftman did not say any of what he was required to say: (a) There is an application process through HDC, (b) You could be accepted or denied, (c) If denied, you have a procedural right to appeal any such denial. Loftman's statement, "What [as an exclamation not a question] I can't get Adam Clayton Powell's [relative in here]" statement was false. He knew it to be false. He intended that it discourage Plaintiff from asking any further questions. And, it succeeded in its intent. Plaintiff was startled to hear that the relation of a powerful political figure could not get into the building as a low-income tenant. So, startled that his inquiry ended in that moment. Had Defendants Spitzer and/or Loftman been in any manner honest they would have, upon receipt of Plaintiff's November 15, 2005 letter, telephoned Plaintiff, made an appointment to discuss the facts contained in Plaintiff's letter. They would have insured that Plaintiff had an opportunity to apply to HDC, to be accepted or rejected. For a sense of how phony and dishonest Defendant Loftman has been, the first sentence of a letter authored by him on September 23, 2009 is telling:

"First I want to say that we are sorry to hear about your ongoing health issues and wish you the best". This was after he had given Plaintiff a copy of the November 2005 letter. This is exactly equivalent to, and rings as "hollow" as, what Defendant Loftman testified to before Judge Charles J. Thomas about stealing Ms. Biehl's money ($ 250,000.00) [In the Matter of Patricia Biehl an Alleged Incapacitated Person, Queens, New York]: "Pat wanted it that way" (at page 6 of and 8). Defendant Loftman's phony sympathy was directed not to Plaintiff but to Mr. Kenneth Kurland of Housing Preservation and Development (NYC) to whom he supplied a copy by certified mail. At that time Mr. Kurland had no way of accessing the genuineness or phoniness of Defendant Loftman's words.

20.    In November 2005 Plaintiff received a disabled veterans benefit at 100% rating although he was actually rated at 60%. The difference was occasioned by the Veterans' Administration's determination that Plaintiff was "unemployable". The amount for each rating, in 2005, was $ 2,299 and $ 839.00, respectively. Succinctly, Plaintiff met the HDC income qualification in November 2005. Had Loftman told the truth, accurately or approximately, Plaintiff would have immediately recognized what he needed to do to assure acceptance of—the not offered—application by Defendant Loftman. Plaintiff would have immediately contacted the VA, asked that they end the designation of unemployable, filed his application, and been approved. This would have made for an additional financial burden, but that burden would have been short-term, since in August of the following year Plaintiff would receive his first Social Security payment (age 62). At HDC's prescribed 30% of income formula, for rental amount, Plaintiff would have, six to eight months after being approved, been better off with the lower VA benefit than the 100% rating, given that by this time his rental amount had risen to $ 1,979.00.

21.    In and about June of 2007 one of Plaintiff's tenant-friends asked that Plaintiff contact Defendant Loftman to learn whether that tenant's security deposit had been processed. (At trial Plaintiff will show that Loftman and Spitzer have been stealing tenants' security deposits, in contravention of New York State Real Property Law to the tune of approximately $ 40,000 per year.) Loftman responded gruffly to Plaintiff's inquiry, which Plaintiff reported to his tenant-friend. As a former military officer and business executive no one has ever spoken to Plaintiff with such discourtesy. Plaintiff's tenant-friend sent an Internet URL for a search on "Brian Loftman". In a comprehensive decision, dated September 30, 2005 Judge Charles J. Thomas of the Queens County Supreme Court delivered a scathing opinion regarding Loftman's

conduct, an attempt to marry a ninety year-old woman and steal her property. His mother abetted Loftman in this scheme, with additional support from his homosexual "partner". The central finding of Judge Thomas was that Loftman was a "grifter". Throughout this tortuous process Plaintiff has come to describe Loftman's behavior more accurately. He is in fact a sociopath/psychopath. This designation is based not only on interactions with Loftman but also on rigorous study and writing on the "type". It is not meant in anyway as a slur. Rather, knowledge of Loftman's typology allows for a readily understood shorthand: one of the best examples being the psychopath's propensity to tell "stupid lies", lying in the face of concrete and irrefutable evidence. (See "36-37", infra.)

22. Plaintiff's lease renewal came again in August 2009. Plaintiff called the management office, asking Loftman whether he had a copy of the November 15, 2005 letter. Loftman responded, "No", but by the time Plaintiff reached the front door, on his way out, the doorperson said, he found it", "You can go pick it up", which Plaintiff did. Plaintiff consulted with a landlord-tenant attorney. That attorney's picked up the telephone, calling "Kenneth Kurland" at Housing Preservation Division (HPD). The attorney did not reach his intended party. Our consultation ended without consummation of an agreement because that attorney wanted a retainer far more than Plaintiff could afford. On arriving back home Plaintiff called HPD reaching Mr. Kurland's very accommodating paralegal. She informed that Plaintiff should attempt to make contact with either of two persons at HDC. Several phone calls and messages later Plaintiff received a call back from "John Simons" of HDC who said he was calling at the instruction, and direction, of his superior Jim Quinlivan. Plaintiff has a folder containing 115 letters, faxes, and related documents, all of which can and will be presented at trial. From this documentation it can be ascertained that the first contact with Kenneth Kurland and Quinlivan was on or about September 29, 2009. The just referenced communications served and continued to serve as clear documentation of what Loftman was doing, his ruses, lies, tricks: in a word, his grift. Plaintiff acknowledges that the amount of communication may seem excessive but there simply is no other way—than rigorous documentation—when dealing with a known psychopath.

23.    For the first time in four years Plaintiff began to get answers as to the status of the building, the application process, the income limits. Within a month Plaintiff was able to begin to establish how his rights had been violated. He sent a FOIL request to HDC that was ultimately answered by Defendant Melissa Barkan. Plaintiff's request, made on October 5, 2009 had been

highly specific using the term "mix formula" "(market, moderate, low)" or "mix" at least four times within the request. A longish paragraph, modeled on the FOIL Website read,

> If documents are denied in part, please specify the legal exemptions claimed for each page or passage. For documents withheld in their entirety please state, in addition, the date of and the number of pages in each document. Please advise me of any destruction of records and include the date of and legal authority for such destruction. I want to see complete sets of records, but if complete sets of records are not extant, then I wish to see any portion of the requested records that exist.

24.     At this juncture it seems appropriate to pause for a contextual overview since the matter would continue unsettled to the present time. On October 12, 2009 Plaintiff received a letter over the signature of Melissa Barkan "Records Access Officer" that stated, "Within ten (10) business days from the date of this acknowledgement of receipt of your request, HDC will provide you with a response either granting your request or denying it in whole or in part." Defendant Barkan's letter response to Plaintiff's FOIL request dated October 27, 2009, based on what would be disclosed on February 5, 2010, was intentionally and knowingly false. Plaintiff has retained all emails from HDC and can provide the actual content of the email and the email "header" for each email.

25.     Plaintiff visited the HDC location to view documents in person. From viewing these documents it was clear to Plaintiff that HDC had either not taken his FOIL request seriously, or, was attempting to deceive Plaintiff. Remarkably, Plaintiff did get to see what he would come to refer to as "the Blue Book", formally titled "Marketing Guidelines, New Housing Opportunities Program" [87 pages] and "the Black Book", "Marketing Programs Low Income Programs" [93 pages] that outline a number of HDC's policies, procedure, rules and practices for interaction with nominal owners and tenants. From these documents Plaintiff and anyone reviewing them would conclude: (a) that HDC understood, with specificity, people grow older, get sick, and adjustments should be considered and made, (b) emphatically, that there should be no way for tenants to determine which apartments were low-income, moderate, or market, (c) that the status of a tenant could change, as well as the status of an apartment, and that a rule was specified for such circumstances—the Next Available Unit Rule, (d) that Section 12 of the Regulatory Agreement put great power in the hands of HDC for breach of "covenant" and provides the stiff sanction of an *Event Default*" [emphasis in the original document] with provision for HDC to apply to a Court for "[12] C. appointment of HDC or a receiver to take

possession of the Project, collect all rents, and pay all necessary cost of the Project…", among other punitive measures, (e) that tenants are "intended third-party beneficiaries" of the Agreement, (f) that no retaliation against "past, current, or, prospective tenants" will be permitted. Plaintiff asserts that Defendants Spitzer and Loftman have repeatedly violated "a" through "f", above. In view on these covenants, rules, practices, and procedures Plaintiff felt confident that HDC would be supportive of his application to the NYS Courts for relief from Loftman and Spitzer's shenanigans. In point of fact, HDC failed to comply with Plaintiff's FOIL request, or made feeble and partial compliance, until February 5, 2010, the very same date that defendants [in a Supreme Court of the State of New York case] were to deliver final papers to plaintiff [therein]. Additionally, Defendant Barkan would collude with Spitzer and Loftman, though their attorney to undercut plaintiff's [therein] case. Plaintiff, herein, had requested an affidavit from John Simon stating that he had in fact said, "Go ahead and apply for the moderate-rate apartment. [Mr. Simons referred to an apartment three doors down the hallway from Plaintiff's apartment.] There is no waiting list for that". Instead Defendant Barkan provided to defendants in the Supreme Court, New York County, an affidavit of Defendant Jim Quinlivan that was, in part, (a) highly critical of your Plaintiff case, (b) selectively true, or (c) completely false. The Supreme Court matter is currently on appeal as the result of gross unethical conduct by Defendants' [Spitzer and Loftman] counsel, and very serious judicial errors (ignored defendants' clear default where there was an audio recording of defendants' lack of excuse or meritorious defense, and, a conversion of defendants' innocuous "cross motion" to a motion for summary judgment without any prior notice to pro se plaintiff).

26. On December 8, 2011 Plaintiff made a new FOIL request to Defendants Barkan and Jahr for documents accrued since February 6, 2010. Plaintiff requested "STRICT COMPLIANCE with the time limits and specific notice of legal exceptions alleged to be taken, as proscribed by New York State law."

27. On January 12, 2010 Defendant Barkan left the following message on Plaintiff's voicemail, "Mr. Corley, it's Melissa Barkan. I am returning your call to Rich Froehlich [HDC General Counsel]. And wondering why you're calling Rich Froehlich. Please call me. I am the Records Access Officer **and** the Deputy Counsel here. To-date I am not sure what you are looking for. Your last conversation via email was that you were going to let me know what sort of certification you need. Our legal assistant said you're looking for an affidavit pro forma. I'm

not sure what that is. So, again, call me directly. I did not receive any voice mails from you today. (212) 227-7412 Thank you. Bye." This message came moments after Plaintiff exited a subway with no phone reception and less than thirty minutes after the call to the Mr. Froehlich was made. Plaintiff clearly communicated with Mr. Froehlich's secretary that he felt it improper to approach the prospective affiant, Mr. John Simons, directly. The message to Mr. Froehlich's secretary left no room for doubt as to its subject and purpose. By knowingly and falsely stating what was and was not available for disclosure under the New York State FOIL Defendant Barkan violated the New York State Penal Law thereby depriving Plaintiff of his Constitutional rights. Defendant Barkan's duties as Records Access Officer were purely "administrative". Her duties as Assistant General Counsel are "judicial" only in the context of a judicial proceeding while appearing before a judge or magistrate. The two roles were in conflict. This conflict resulted in deprivation of Plaintiff's Constitutional rights. Neither Defendant Barkan, nor her employer, were parties to the State Court proceeding.

28.     [Retuning to the chronological thread] Conversations and written communication continued with Mr. Simons until he finally understood what and how Spitzer and Loftman had violated Plaintiff's rights. Of the correspondence just mentioned Spitzer and another signatory to the Agreement, Ron Moelis, were routinely copied in by certified mail, return receipt. Also routinely copied in was Defendant Quinlivan. Not later than December 17, 2009 Defendant Marc Jahr was read into the correspondence. On or about DATE John Simons said, "Go ahead and apply for the moderate-rate apartment. [Mr. Simons referred apartment 536] There is no waiting list for that" [unlike the low income apartments]. Plaintiff reminded Simons that had he been permitted to apply in 2005 he would have come to the top of the list many times over.

29.     Immediately after contact with Simons, Plaintiff contacted Defendant Loftman at his office in the building, reporting what Mr. Simons had said. Defendant Loftman said he would not supply the application for low- or moderate-rate apartment, that Plaintiff could only complete the application in his office, and that Plaintiff could not make or have a copy. All of the communication with Defendant Loftman was recorded and saved in Compact Disc format. The reason for this, Plaintiff would later learn, is that Defendant Loftman, on behalf of Defendant Spitzer, employed a third-party to complete applications on behalf of the applicants. This was, and is, true not only for new applicants but "recertification" also. The applicant signs the forms but is told to leave the income amount blank. When Plaintiff called to learn the status of his

application, specifically whether it had been submitted to HDC Defendant Loftman said, "You only completed the first half of the application." Defendant Loftman then said he had sent Plaintiff a letter by certified mail. Plaintiff had not received the alleged letter. He asked Defendant Loftman to either resend the letter or leave a copy at the front desk. Loftman refused both alternatives (all recorded to CD audio.) Plaintiff contacted HDC to get a copy of the purported letter from their records. On December 18, 2009, within two hours of Plaintiff's request to HDC, a copy of Defendant Loftman's letter was supplied to him by email.

30.   For the full time of Plaintiff's tenancy at the building Defendant Loftman, or his subordinate, could be observed at tenants' mailboxes stuffing the boxes with "management notices" or monthly "rent billings". The latter billings contained a space for a postage stamp. This practice, in violation of United States Postal Service law stopped once Plaintiff notified the State Court. The fine for Defendants Spitzer and Loftman's tampering with tenants' mailboxes exceeds $ 414,000.00 [230 apartments multiplied by a monthly occurrence for a minimum of six years].

31.   Defendant Loftman stated in his letter that Plaintiff was did not qualified because he had a felony conviction and poor credit. He specifically asserted, "As per New York City Housing guidelines, anyone with a criminal record or judgments are precluded from renting any of the low or middle income units." Defendant Loftman's statement was false; he knew it to be false; he intended that Plaintiff and HDC rely on his putative restatement of law. Defendant Loftman published this letter, dated December 1, 2009 to Defendant Quinlivan and Mr. John Simons, as well as to Defendant Joseph Spitzer and Mr. Ron Moelis, a signatory to the Agreement who is not specifically named as a Defendant at this time. In the later State Court proceeding Defendant Quinlivan would state under oath that landlords "may establish" particular grounds for disqualification. HDC's "Blue Book" and "Black Book" establish two, and only two, grounds for denial of application, viz., the applicant is a fugitive from justice or has been convicted of application fraud for subsidized housing. Neither of these applied to Plaintiff. (The recording, CD audio, of conversations, with Defendant Loftman is compelling on these points.) Plaintiff respectfully urges this Court to note that had Plaintiff succumbed to Defendant Loftman's entreaty to commit fraud, in November 2005, Plaintiff would have long since been evicted. This Court may also take judicial notice of the sworn testimony of Ms. Tania Pumarol in Housing Court, New York County, a proceeding for eviction brought by Defendants Loftman

and Spitzer in which Ms. Pumarol testified that she filled in the income amounts of all applications and recertifications. The respondent in that proceeding was a poor person of color, attempting to provide shelter for a battered friend. The case was dismissed on the merits in 2011. Similarly, Defendants Spitzer and Loftman sought to evict a Hispanic female tenant, with five children. That case also was dismissed on the merits in 2011.

32.    Plaintiff sent a copy of the CD recording to Defendants Marc Jahr and Jim Quinlivan, among others, by messenger along with an explanatory note and a legend of start times on the disc for different track times in late December 2009. No response was had from Defendant Jahr, Quinlivan, or any other person on behalf of HDC.

33.    Plaintiff continued his attempts to get HDC to reign in Defendant Loftman through the end of 2009 and beginning of 2010. Ultimately Plaintiff had no choice but to bring suit against Allstate Realty Associates and 100 Street Tri venture LLC. It was in this proceeding that Defendants Barkan, illegally, and Quinlivan, unlawfully, acted to intentionally violate Plaintiff's civil rights. (Plaintiff apologizes for the repetition.) Defendant Quinlivan had no direct or personal knowledge of the facts as relating to Plaintiff. Plaintiff spoke only with Mr. John Simons. At best Defendant Quinlivan could swear, under oath, about HDC's internal policies as to financial matters since he was a "portfolio manager" not a specialist in civil rights. That he did in a substantially less than honest way. Plaintiff does not take on Mr. John Simons as his own witness—yet—but Mr. Simons could have a sworn or affirmed of his own personal knowledge something Defendant Quinlivan could not do. Defendant Barkan prevented Mr. Simons from supporting Plaintiff's truthful statement of facts. She did do with malice and the intention of harming Plaintiff. Defendant Quinlivan, by his improper affidavit, harmed Plaintiff legally, mentally, emotionally, and financially.

34.    On June 16, 2011 Plaintiff's former attorney sent a certified letter to Defendant Joseph Spitzer with copies to Defendant Marc Jahr, Mr. Ron Moelis, and Mr. David Kaplan, Wachovia Multifamily Capital [banker to HDC and Defendant Spitzer] in an attempt to resolve these matters. The letter reminded the addressees that they had each received a copy of the CD recording referenced throughout this Complaint. The third and fourth paragraphs of Mr. Baxter's letter read as follows:

"Mr. Corley has two simple demands: (1) that you terminate Brian Loftman's employment forthwith, making it plain, in writing, that he is never again to enter the premise at 1955 First Avenue, and (2) that you provide Mr. Corley with a new lease in

the amount of $ 600.00 monthly, a sum based on his income in 2005, and a sum greater than you are entitled.
Please contact Mr. Corley within the next ten (10) business days on these points."

35.   In June 2011 Plaintiff encountered Defendant Spitzer in the building garage as Plaintiff was going to the bus to take his thrice-weekly physical therapy. Plaintiff had never spoke to Defendant Spitzer before this time, other than a passing greeting. Plaintiff asked Defendant Spitzer whether he knew who Plaintiff was. Defendant Spitzer responded, "No". Plaintiff asked, "Have you listened to the CD recording. Spitzer responded, "What CD recording?" (It had been sent by certified mail.) Plaintiff identified himself by name and apartment number. Spitzer said, "Oh, you're the person who has sent me all of those *beautiful letters*…you are living here without a lease." Plaintiff said, "No, I have a lease…Loftman is a liar. I urge you to listen to the CD and remove him from the building." Spitzer asked, "What about him?" [Spitzer was pointed to the building superintendent who has kneeling on the ground making a repair] Plaintiff said, "I have no problem with him. He's a great guy." Spitzer said, referring to Loftman, "I am not going to do anything about him. I am going to support my *workers*." Plaintiff repeated, "You should listen to the CD". Spitzer said, "*I do what my lawyer tells me to do.*" The conversation ended with, Spitzer, "Have a great weekend." Plaintiff, "You too."

36.   On August 1, 2011 Plaintiff received a lease renewal package. This package did not contain the customary "Preferential Rent Rider" that Plaintiff had received with all prior renewals. On August 8, September 19 and October 5, 2011 Plaintiff communicated by certified letter with Mr. Todd Rose, a principal in the law firm of Rose & Rose, located at 291 Broadway, New York, as he was known to represent Defendants Spitzer and Loftman. Defendant Spitzer was copied to the letters. The letters informed Mr. Rose of Defendant Loftman's "game" and "grift", asking him to intercede to stop Defendant Loftman. The October 5, 2011 letter informed Mr. Rose of conversations Plaintiff had first with Ms. Devorah Weiss of Allstate Realty "Leasing Department" and then with Ms. Elena Rodrigues at the management office located in the building. The conversations with Ms. Weiss and Ms. Rodrigues were recorded. Ms. Weiss told Plaintiff that she had no involvement with the "Rider" that it originated "only" from the Aspen management office. Ms. Rodrigues repeated Plaintiff's question as to why he had not received a "Rider" to which Defendant Loftman replied, "You are not current with your rent." Defendant

Loftman's statement was false; he knew it to be false; he intended Plaintiff to rely on his false statement; and was preparing to use his false statement to evict Plaintiff from his residence.

37.   Plaintiff made contact with the Urban Justice Center in New York City. On October 20, 2011 Ms. Kelly Wehrle wrote to Mr. Rose and Defendant Spitzer demonstrating that Defendant Loftman had lied. On December 1, 2011 Plaintiff mailed a check in the amount of $ 600.00 to the Allstate Realty Associates office in Brooklyn. Plaintiff included with the check a copy of the rent billing an explanatory note, and Mr. Baxter's letter of June 16, 2011, and a letter from HDC. Defendant Loftman retuned Plaintiff's check. On December 6, 2011 Defendant Loftman sent a letter to Plaintiff making a claim of rent of for December of $ 2,569.29 and an additional security deposit of $ 515.28.

38.   Accordingly, this suit is filed. Only two pertinent factual allegations remain to be stated.

39.   Plaintiff knows or is friendly with the greater number of tenants in the building and has substantially more that salutary exchanges with them. At this point Plaintiff feels an obligation to protect the tenants mentioned from certain retaliation by Defendants Spitzer and Loftman. Yet, Plaintiff must provide sufficient information so that Defendants can identify the tenants to whom Plaintiff refers.  One disabled tenant, visibly so, has been a resident since the building opened in 2004. He has had no increases in rent, or so nominal an increase as to say "no increases" since his initial tenancy. Upon information and belief his income is far greater than Plaintiff's. He is Jewish. Another tenant is retired and rents at the "market-rate". She has had nominal, to no, rent increases throughout her seven-year tenancy. She also is Jewish. When Plaintiff asked this tenant about her "Preferential Rent Rider" she said, "I go down there and *schmoose* with him [Defendant Loftman] about his [homosexual relationship, and partner]." When asked why she would not apply for a moderate-rate apartment, she being fully qualified, she responded, "I'm scared". A tenant of color asked Defendant Loftman to move to a larger apartment two years ago. Defendant Loftman refused to allow him to move. After Plaintiff's State Court suit this tenant's wife, who is "white", asked Ms. Rodrigues for the move. They are now in a larger apartment and [it is expected by this date] the parents of a new baby. A "white" Jewish woman had her rent repeatedly reduced to an amount far below market rate and well below Plaintiff's rent—in one of the patio apartments mentioned in "15" above. At trial Plaintiff will show that Spitzer and Loftman have demonstrated a pattern of racial animus that is "over-

the-top" palpable. Defendants Spitzer and Loftman have a practice and pattern of rewarding tenants who are white, Jewish, or homosexual while punishing tenants who are "black", Hispanic, Asian, or, families with young (well-behaved) children. (Please see Housing Court decisions in and 100 Street Tri Venture LLC against Quinones, and, separately, against Carolyn Isaac, both utterly frivolous and, explicitly, dismissed on the merits.)

40.    Defendant Loftman has repeatedly expressed a perversion of baiting "black" males toward violence. One documented instance involves the father of Ms. Quinones' children, the details of which are contained in the Housing Court file. Plaintiff had, much earlier, heard reports of very similar behavior concerning the guests of other tenants but—to his shame—discounted these reports. Another instance involves an older, highly respected, "black" male with whom Defendant Loftman escalated his baiting to the point of asking this gentleman, "You want to hit me, don't you?" Twice on heading out to court, on a date and time Defendant Loftman knew in advance, Defendant Loftman was waiting in the building lobby as Plaintiff exited. He had with him his "witnesses". Providentially, Plaintiff greeted Defendant's assembled "witnesses" with an appropriate, "Good morning", and did not see Defendant Loftman until Plaintiff was nearly out the front door. No comment was made to Defendant Loftman as he had his back turned. Prior to receiving the Internet URL about Defendant Loftman, and on one of the occasions Plaintiff observed Defendant tampering with the tenants' mailboxes, Plaintiff observed this Defendants demeanor as inviting an angry response. On several occasions Defendant, for absolutely so reason, displayed an angry, threatening attitude toward Plaintiff. This happened, in the elevator, in the courtyard, in the hallway and in the lobby. Plaintiff is well known in the building for a pleasing and friendly disposition. After seeing the Internet URL Plaintiff could make some sense of Defendant Loftman's behavior but was not clear about why it was directed toward Plaintiff. After reading the report of intended escalation to violence of Ms. Quinones' children's father a complete explanation for Defendant Loftman's perversion fell into place. Additional instances of this perversion will be provided at trial of the matter.

41.    On August 1, 2011 Defendant Loftman posted a notice, "Management Letters", on the bulletin board in the lobby, which was the alternative chosen once mail tampering was reported ("30" above). Exactly thirty-four apartments are listed on that form, including Plaintiff's apartment, "540". No other tenant had a "Preferential Rent Rider" removed from the "lease package". Only Plaintiff herein did not receive the customary "Rider".

42.    On August 8 and 16, 2011 Plaintiff wrote to the Commissioner of the Mayor's Office on Veterans Affairs having personally experienced one of his employees assistance moving another NYC Agency from apathy to positive action. In a later face-to-face conversation the Commissioner said he would initiate a Commissioner-to-Commissioner contact with Defendant Marc Jahr. Shortly thereafter the just-mentioned MOVA employee telephoned to alert Plaintiff to make contact with HDC's "compliance unit" by email at "Compliance @ NYCHDC". Beginning on August 17, 2011 Plaintiff provided this "unit" with several relevant documents and information, the last of which contained a second outline of events, enumerating several of the factual allegations contained in this Complaint. The "unit" did not reply to any of Plaintiff's four emails. On November 16, 2011 Plaintiff forwarded each of the four emails to Defendant Jahr directly. On or about November 24, 2011 a letter over the signature of Ms. Teresa Gigliello, Senior Vice President, Portfolio Management was received. In sum and substance the November 22, 2011 letter of Ms. Teresa Gigliello, on behalf of Defendant Jahr, stated that HDC is not a "party to your lease", that HDC stands by the previously submitted "affidavit", that HDC has "addressed your concerns to the fullest extent of our authority and ability" and to "contact your landlord or building manager with questions about your lease". Based on the forgoing Plaintiff respectfully asserts that all of Ms. Gigliello's remarks additionally injure Plaintiff, particularly the assertion that HDC lacked "authority". Plaintiff respectfully submits that on the basis of the relevant Section of the Regulatory Agreement, and the facts stated above, it should be HDC bringing suit against Defendants Spitzer and Loftman on behave of Plaintiff as an "intended third-party beneficiary".

43.    Plaintiff cannot afford the cost of an attorney at the present time. Neither can Plaintiff afford the filing fee. In view of Defendant Loftman returning Plaintiff's check he is willing to risk that this Court will act favorably before Defendants Spitzer and Loftman can make another attempt to evict him. Upon this Court's filing of its Findings and Recommendations, or Decision, or Order, Plaintiff anticipates that, within thirty days of the date of such filing, an attorney duly admitted to appear before this Court will become available to represent him. Pertinent letters referenced within will be included in the application that accompanies this Complaint.

**INJURIES**

44.     As of this date actions of Plaintiffs have cost excess of $ 110,000.00 in rent actually paid versus what should have been paid. Defendants have directly caused substantial damage to Plaintiff's credit standing, once rated "excellent" by the three established rating agencies.

45.     On May 15, 2011 Plaintiff was hit by a yellow taxicab as a pedestrian two blocks from 1955 First Avenue. Plaintiff has not yet ruled out this traffic incident as "commissioned" by Defendants Spitzer and/or Loftman. Plaintiff will be able to make that determination in the next sixty to ninety days based on very specific procedural events.

46.     As the result of Defendants actions and *deliberate indifference* Plaintiff has experienced emotional distress, unnecessary stress, anxiety, and extreme fear. Plaintiff believes these damages exceed $ 5,000,000.00

47.     Plaintiff suffers from an aortic aneurism, tortuous aorta, defective heart valve, high blood pressure and cholesterol among other conditions. The present ordeal has continued from September 2009 to the present, including a nerve-wracking attempt by Defendants to cause Plaintiff's eviction from his home.

48.     It is difficult for Plaintiff to apportion his physical and mental/emotional injuries attributable to these Defendants at this moment at time. What is without any doubt true is that Defendants have exacerbated Plaintiff's existing conditions and delayed his recovery substantially. Plaintiff is under the care of a Primary Doctor, Pulmonologist, Neurologist, Cardiologist, Clinical Psychologist, and Physiatrist. Since May 15, 2011 Plaintiff attends physical therapy three times per week and has very regular examinations by his Physiatrist.

**RELIEF**

49.     Plaintiff is not an attorney nor does he pretend to be. Under "normal" circumstances his intelligence, as recently measured, is considerably above average, the traffic incident and brain damage notwithstanding. Because of the apparent mismatch between actual income and actual usable income caused by Defendants actions and omissions Plaintiff cannot avail himself of any of the free legal services available in New York City. They will not take him.

50.     Plaintiff feels, based on the detailed account provided hereunder, that this Court is

in a much better position than he to determine the elements of the United States Constitution violated by Defendants, as well as the Statutes and Laws applicable.  Plaintiff believes the Court does have authority to declare HDC and Defendant Spitzer in substantial default of the Regulatory Agreement signed on November 13, 2002, to declare a "Default Event", and to assign a receiver for the property.

51.     An application for order to show cause is filed simultaneous with this Complaint, which Plaintiff prays will mitigate further damage by these Defendants.

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 11th day of December, 2011

Signature of Plaintiff _____

William B. Corley

Mailing Address     1955 First Avenue, Apt 540
New York, NY 10029

Telephone Number    (212) 931-0450
Fax Number          None